IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-74,129






KENNETH VODOCHODSKY, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM KARNES COUNTY






 Keasler, J., delivered the opinion of the Court in which Price, Womack, Johnson,
and Holcomb, JJ., joined. Keller, P.J., filed a dissenting opinion in which Meyers, J.,
joined. Cochran, J., filed a concurring opinion. Hervey, J., did not participate.


O P I N I O N



 We withdraw our previous opinion and substitute this one. We deny the State's
motion for rehearing.

 In February 2001, a jury convicted Kenneth Vodochodsky of killing a peace officer
who was acting in the lawful discharge of an official duty. (1) Pursuant to the jury's answers
to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, §§ 2(b)
and 2(e), the trial judge sentenced Vodochodsky to death. (2) Direct appeal to this Court is
automatic. (3) Vodochodsky raises four points of error. We sustain his second point of error,
which alleges that the evidence is factually insufficient. We reverse his conviction and
sentence. 

A. The Victims


 In the early evening hours of October 12, 1999, Atascosa County Sheriff's Deputies
Thomas Monse and Mark Stephenson and Texas Department of Public Safety Trooper Terry
Miller were ambushed and killed by multiple gunshots. Monse died from eighteen gunshot
wounds caused by rifle, shotgun, and handgun fire. Two of his wounds were caused by close
range handgun fire to his face. Stephenson died from eleven gunshot wounds caused by rifle
and handgun fire. Stephenson also had wounds which were caused by close-range handgun
fire to his face. Miller received two wounds from rifle fire. The shot through his head killed
him. Several other officers involved in the conflict were also injured. 

 At the end of the incident, the shooter, Jeremiah Engleton, killed himself with a
gunshot wound to his head. Near his body lay an SKS Norenco 7.62 x 39mm semiautomatic
rifle, a Mossberg 12-gauge pump-action shotgun, a Ruger 9mm semiautomatic handgun, and
a Glock .40-caliber semiautomatic handgun. The police also found a Lorcin .380-caliber
semiautomatic handgun in Engleton's pants' pocket and a suicide note in his right shoe. 

 Vodochodsky was subsequently indicted for intentionally or knowingly causing
Monse's death by shooting him with a firearm. The indictment further charged that "the said
Thomas Monse was then and there a peace officer . . . who was acting in the lawful discharge
of an official duty, and [Vodochodsky] knew Thomas Monse was a peace officer." At trial,
the jury was instructed on the law of parties and authorized to find Vodochodsky guilty if
they found that he acted "with intent to promote or assist Jeremiah Engleton to commit the
offense of capital murder, and did then and there solicit, encourage, direct, aid or attempt to
aid Jeremiah Engleton to commit the offense . . . ." 

B. The Crime Scene


 Jeremiah Engleton, his wife Violet, their infant daughter, Violet's sister Sara Lopez,
her two children, and her boyfriend Kenneth Vodochodsky (who had been Engleton's friend
since they were small boys) lived in a three-bedroom home in rural Atascosa County just east
of Pleasanton. A thickly overgrown field surrounded by a barbed-wire fence sits across
Corgey Road to the north of the residence. Two driveways enter the property - from Corgey
Road to the north and from Coughran Road to the west. In the field to the north of Corgey
Road, the barbed wire fence had been cut, apparently to facilitate the shooter's movement
between the field and the residence. The field was littered with over a hundred spent rifle
and shotgun casings, and the police found several locations in the field that appeared to be
shooting positions. 

 Monse and Stephenson were gunned down near their vehicles at the north end of the
residence. Miller was shot as he backed his vehicle away from the residence. Others were
wounded as they stood behind Miller's vehicle trying to assess the situation. 

C. The Sequence of Events


 On October 11, 1999, Engleton came home late in the evening and immediately got
into an argument with Violet. He struck her and pointed a gun at her head. Around
midnight, in response to Engleton's violent behavior, Violet called the Atascosa Sheriff's
Office, and Deputy Monse was dispatched to their residence. About the time Monse was
exiting his vehicle, Engleton asked Vodochodsky, "Do you remember what we've been
talking about? I'm going to do it right now." According to Sara, Vodochodsky replied, "No,
it's not worth it." Sara testified that she didn't ask any questions because she "didn't want
to hear the answers." She "felt" that Vodochodsky knew something but she "didn't want to
hear it out of his mouth." Monse then arrested Engleton but allowed him to leave
Vodochodsky his wallet and $1,000.00 to bail him out the next day. Engleton was booked
into jail at 1:10 a.m. on October 12, 1999.

 Later that morning, Engleton commented to his cellmate, Orlando Garcia, that "[t]hese
motherfuckers don't know what they got coming," and that it was going to make the front
page. Garcia also overheard a telephone call Engleton placed to Vodochodsky, during which
Engleton told Vodochodsky to make sure that Violet did not take his "SK" (an SKS Chinese-
or Russian-made semi-automatic assault rifle) or his "nine" (a 9 millimeter semiautomatic
pistol). Engleton also told cellmate Phillip Darrah that he had been arrested for domestic
violence and that when he got out he "had plans and planned to make some headlines." 
Darrah also overheard a telephone conversation between Engleton and Vodochodsky during
which Engleton asked Vodochodsky to take care of his belongings and specifically
mentioned the "SK." Engleton also told Vodochodsky to bring the $1,000.00 he left him to
make his bail. 

 While Engleton sat in jail, Sara and Violet moved some of Violet's property into a
storage facility and obtained a restraining order requiring Engleton to vacate the residence
by 5:00 p.m. that evening. Shortly after noon, they packed up more of Violet's property and
left for Vodochodsky's parents' house in nearby Floresville.

 At 2:12 p.m., Vodochodsky posted Engleton's bail. Between 3:30 and 4:30 p.m., the
two men went to a Pleasanton gun shop where Engleton purchased several boxes of
ammunition. Wayne Balzen testified that he was working at the gun shop the day that
Engleton and Vodochodsky came in to buy ammunition. He testified that they came in
together but Engleton asked for the ammunition while Vodochodsky was farther down the
counter, "peering and looking at guns." Engleton asked for a number of different kinds of
ammunition, including some "softnose" rounds. Balzen testified that "hardnose" rounds are
generally used for target shooting and "softnose" rounds are primarily for hunting. He also
testified that Engleton asked for "subsonic" ammunition, which is special because it is
"loaded with hydroshock bullets" and is primarily used by law enforcement.

 After purchasing the ammunition, Vodochodsky and Engleton returned to their
residence. Around 5:30 p.m., Sara called the house and Vodochodsky told her that Engleton
had left. Sara, Violet, and Vodochodsky's brother Anthony then left Floresville and drove
toward the residence. When they arrived, they saw Engleton's vehicle and continued on to
a grocery store in Pleasanton. Sara then called Vodochodsky again. At first Vodochodsky
acted like he was angry because they had not shown up, but then he dropped his voice to a
whisper and told Sara not to come home. Instead, he told Sara that he would meet her at
Anthony's house later. Sara and Anthony left Violet with a friend and went to Anthony's
house. After that, the events occurred in the following order:

7:45 p.m. A neighbor, Edward Essary, drove past Vodochodsky's residence on his way
to Wal-Mart. As he passed the residence, he saw Vodochodsky loading "stuff"
into his vehicle.


8:07 Police received a "911" call to the Atascosa County Sheriff's Office from
Engleton's home. Vodochodsky was still at the residence.


8:13 Monse and Stephenson were dispatched to the residence.


8:28 Monse arrived at the residence and apparently was immediately shot and killed
from a position about 75 feet away, from the field across Corgey Road from
the Engleton residence.


8:30 Stephenson arrived.


8:31 Stephenson very faintly radioed in that he had been hit. At approximately this
same time, Vodochodsky's neighbor, Robert Hutton, heard several gunshots. 
As he sat in his car at the adjacent intersection, Hutton saw two patrol cars on
Vodochodsky's property with their headlights on. He also noticed that the
security light in the back of the residence was off. Further, Hutton noticed a
flashlight moving on top of Vodochodsky's residence and concluded that a
person was walking around on the roof. He noted that the individual was on
the backside of the pitched roof near the north end of the residence
overlooking the deputies' vehicles. Later, seven fresh shell casings were
found behind the house, close enough to the house that it appeared that they
had rolled off the roof. After 45 seconds to a minute, Hutton drove away.


8:37 Miller was dispatched to the residence to check on Monse and Stephenson
because they could not be reached by radio. Also around this time period, but
before Miller arrived at the residence, Essary returned from Wal-Mart. As he
passed Vodochodsky's home, he noticed the two deputies' vehicles in
Vodochodsky's north driveway. After arriving home and putting away his
purchases, Essary became concerned about the events at Vodochodsky's
house. He then got back in his car and drove toward the house. 


8:51 Miller arrived at the residence.


8:52 Miller radioed in "officer down" and requested assistance. As Miller was
backing away from the residence in his vehicle, he was shot and killed while
still in his vehicle. As Essary approached Vodochodsky's house, he saw a
highway patrol vehicle backing away from the residence and heard gunfire. 
As Essary passed the residence, he saw a flashlight on the ground at the north
end of the residence. Essary turned the corner and made his way to another
neighbor's house.


8:56 Pleasanton Police Department Officer Louis Tudyk arrived at the intersection
adjacent to the house. He parked his vehicle behind Miller's vehicle.


8:57 Retired United States Border Patrol Special Agent Carl Fisher pulled his truck
up alongside Tudyk's vehicle.


8:58 Tudyk and Fisher were shot and wounded.


9:00 Vodochodsky arrived at Anthony's house, which is located 21.7 miles from his
own. He told Anthony that he drove straight there from his house, a trip which
should take 21 to 23 minutes depending upon speed and traffic. Vodochodsky
told Sara that Engleton was going to kill himself, and that he wanted to watch
the news. Sara told Vodochodsky that Engleton's suicide would not be on
television. Sara wanted to go to the residence to help Engleton, but
Vodochodsky did not want to go. Over Vodochodsky's objection, Sara called
Violet to tell her that Engleton planned to kill himself. Vodochodsky
eventually agreed to go to the residence. 


10:47 Vodochodsky and Sara arrived at one of the roadblocks attempting to get to the
residence, but they were not allowed through. They then went to pick up
Violet and returned to Anthony's house. After arriving at Anthony's house,
Vodochodsky gave Violet a farewell letter from Engleton. Throughout this
time period, many other officers arrived at the residence and took part in the
standoff. Finally, with the help of officers in a San Antonio Police Department
helicopter, ground officers pursued Engleton. Before they reached him,
Engleton shot himself in the head and died.


 Either the night of the killings or the next day, October 13, Vodochodsky admitted to
Sara that he was at the residence when the bogus 911 call was made, but he denied making
it himself. Around 2:00 p.m. on October 13, Vodochodsky spoke with Texas Ranger Tony
Leal about the events of the previous day. Vodochodsky told Leal that he left his house at
8:00 p.m. the previous evening and drove directly to his brother's house in Poteet. 
Vodochodsky also indicated to Leal that he did not know about Engleton's plans regarding
the night of the murders. 

 Around 1:00 p.m. on October 14, Vodochodsky talked to Essary about the killings. 
During this conversation, Essary showed Vodochodsky where he had seen the flashlight the
night of the killings. In response, Vodochodsky stated, "Yeah, that's where one of the pigs
- that's probably where one of the pigs got shot at." Vodochodsky also told Essary that he
bailed Engleton out of jail "[t]o do this." Essary unequivocally told the jury that
Vodochodsky made the statement in a tone that indicated that he was proud of his actions.

 Vodochodsky told Essary that Engleton wanted to do this the night that the police
came to arrest him for assaulting Violet, but Vodochodsky told Engleton, "No, . . . we ain't
got nothing planned yet." Vodochodsky told Essary that Engleton was going to kill himself
and "take some pigs with him." Vodochodsky then stated that "that would be less pigs in the
world." Vodochodsky told Essary that, after he bailed Engleton out, the two of them went
to the gun store and bought "$200 worth of the best ammo." He said that, after they returned
home, Engleton kept four guns and Vodochodsky loaded the rest in his car as well as some
other items "because the police were coming and he took the stuff that they would
confiscate." Along with other weapons, Vodochodsky also took some tools, the "papers" to
the house, and the "papers" to Engleton's boat. When Essary commented about how the
police cut up the fence across the street, Vodochodsky responded, "No, that's where
[Engleton] cut it up" and "that's where he was shooting at." Vodochodsky further
commented to Essary that he knew that Engleton had gone "over the edge" when he took the
deputy's gun. He also told Essary that he was still at the house when Engleton made the 911
call.

 Lisa Sandberg, a reporter for the San Antonio Express News, testified that she
interviewed Vodochodsky in the spring of 2000. During that interview, he told her that
Engleton had been very upset about his arrest and at one point had said that he wanted to kill
some deputies. Vodochodsky said that he had not taken Engleton seriously and had told him,
"Don't worry about it. I'll get you out of jail." He said that he had told Engleton, "it's not
worth it." Vodochodsky told Sandberg that, after he bailed Engleton out of jail, they had
gone "to a gun shop where they bought ammunition" to use at a firing range. Vodochodsky
also told Sandberg that he had not had any "prior knowledge" of Engleton's "plan" and that
he had had no idea that Engleton "would use the more than 300 rounds of ammunition to
fatally shoot the officers." Vodochodsky told Sandberg that he left the residence at 7:45 p.m.
on the night of the murders. Sandberg also testified that, when she was interviewing him,
Vodochodsky asked her what section of the newspaper the article would appear in. When
she told him that it might appear on the front page, Vodochodsky said that that was
interesting.

 Violet Engleton testified that she, Engleton and Vodochodsky watched the movie "Set
it Off" often, and that they all liked it. In that movie, she testified, four girls rob a bank and
then die in a shoot-off with police officers. She testified that Engleton said that that is the
way that he would like to die. Sara Lopez also testified that Engleton and Vodochodsky
watched that movie a lot. She testified that when she watched "Set it Off" with Engleton,
he told her that "if he was ever wanted by the law, that's how he would go out" and that
Vodochodsky "said the same thing."

 Some time after Vodochodsky was incarcerated, jail personnel found in his possession
a note containing numbers and simple mathematical calculations. Beside one number was
the word "bond" and beside another number was the word "bullets."

D. Analysis


 In his first point of error, Vodochodsky asserts that the evidence is legally insufficient
to support the jury's verdict of guilty of capital murder. In his second point, he asserts that
the evidence is factually insufficient. As previously noted, Vodochodsky was indicted for
intentionally or knowingly causing the death of Thomas Monse, a person he knew to be a
peace officer acting in the lawful discharge of his duty, by shooting him with a firearm. 
After the presentation of evidence, the court charged the jury that it could find Vodochodsky
guilty if it found that he acted with the intent to promote or assist Engleton in committing the
offense of capital murder, and Vodochodsky did then and there solicit, encourage, direct, aid
or attempt to aid Engleton in committing the offense. It is well settled, and Vodochodsky
does not contest the rule, that the law of parties need not be pled in the indictment. (4) Further,
Vodochodsky does not challenge the fact that Engleton intended to kill a peace officer who
was acting in the lawful discharge of his duties. Instead, Vodochodsky contends that he was
merely present at the scene and, therefore, cannot be held responsible for Engleton's acts. 

 In reviewing the legal sufficiency of the evidence, this Court looks at all of the
evidence in the light most favorable to the verdict to determine whether any rational trier of
fact could have found the essential elements of the offense beyond a reasonable doubt. (5) In
determining whether evidence is sufficient to convict, we must examine the totality of the
circumstances. (6) Texas Penal Code § 7.01(a) states that "[a] person is criminally responsible
as a party to an offense if the offense is committed by his own conduct, by the conduct of
another for which he is criminally responsible, or by both." A person is criminally
responsible for the conduct of another if "acting with intent to promote or assist the
commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other
person to commit the offense[.]" (7)

 A rational jury could conclude from this evidence that Vodochodsky was present
during the shoot-out and that he participated in part of it. The evidence established that
Engleton was shooting from the field across Corgey Road, approximately 75 feet away, while
another person was shooting from the roof of the house. Vodochodsky's statements about
when he left the house were inconsistent - he told Sandberg and Leal that he left before the
911 call was made, but admitted to Sara and Essary that he left after the 911 call had been
made. He told Anthony that he had driven from his house directly to Anthony's house, but
it is only a 23-minute drive and he arrived at Anthony's house at 9:00 p.m. Vodochodsky
was also inconsistent about whether he was aware of the plan to murder police officers,
telling Sandberg and Leal that he was unaware of the plan but telling Sara and Essary that
he knew of the plan.

 The night before the offense, Engleton expressed a desire to "do it right now" and
Vodochodsky told him they did not yet have a plan. A rational jury could conclude from this
evidence that Engleton had a plan to kill a peace officer, that Vodochodsky was aware of
Engleton's plan, and that Vodochodsky wanted to wait until the plan was foolproof. On the
day of the crime, Vodochodsky bailed Engleton out of jail, later telling Essary that he bailed
him out "to do this." A rational jury could conclude from this evidence that Vodochodsky 
bailed Engleton out of jail specifically to carry out the plan to kill peace officers. Knowing
that the police were coming and knowing that Engleton intended to commit suicide after his
killing spree, Vodochodsky took many items from the house. A rational jury could conclude
from this evidence that Vodochodsky sought to help Engleton wrap up his affairs as part of
his participation in the plan. Finally, Vodochodsky commented to Essary after the crime that
he knew that Engleton had "gone over the edge" when he took the deputy's gun. A rational
jury could conclude from this evidence that Vodochodsky was still at the residence and
witnessed at least Monse's murder, despite any claims to the contrary. 

 In light of this evidence, we hold that a rational jury could have found beyond a
reasonable doubt that Vodochodsky acted with an intent to promote or assist Engleton in
committing this offense. Point of error one is overruled.

 In a factual sufficiency review, we view all the evidence in a neutral light, both for
and against the finding, and set aside the verdict if "proof of guilt is so obviously weak as to
undermine confidence in the jury's determination, or the proof of guilt, although adequate
if taken alone, is greatly outweighed by contrary proof." (8) In conducting such a review, we
consider all of the evidence weighed by the jury, comparing the evidence which tends to
prove the existence of the elemental fact in dispute to the evidence which tends to disprove
it. (9) We are authorized to disagree with the jury's determination even if probative evidence
exists which supports the verdict, but we must avoid substituting our judgment for that of the
fact-finder. (10) 

 In this case, the overwhelming weight of the evidence mitigates against the conclusion
that Vodochodsky solicited, encouraged, directed, aided or attempted to aid Engleton in
committing the offense. All of the evidence that could legally support a rational jury's
conclusion is nevertheless so weak that our confidence in the jury's verdict is undermined. 
Although there was some evidence of a second shooter on the roof, this was not established.
While Vodochodsky's statements were inconsistent, the inconsistencies were minor. When
Engleton expressed a desire to "do it right now" and Vodochodsky told him they did not yet
have a plan, neither man specifically mentioned killing a peace officer. When Vodochodsky
told Essary that he bailed Engleton out of jail "to do this," he did not specifically state that
he bailed him out as part of a plan to kill police officers. Vodochodsky removed belongings
from the house, but there is no proof that he did so as part of a murderous plot. And
Vodochodsky's comment to Essary that Engleton had "gone over the edge" when he took the
deputy's gun could just as reasonably have been a speculative comment, not one indicating
that Vodochodsky had witnessed Monse's murder.

 Indeed, none of that evidence necessarily suggests that Vodochodsky acted with intent
to promote or assist Engleton. None of his statements directly refer to killing police officers.
His statements are devoid of information on the details of the alleged murder plot, and there
is no other information in the record suggesting that Vodochodsky was planning the event
with Engleton. 

 Furthermore, other evidence suggests that Vodochodsky was not working with
Engleton. His whispered warning to Sara could indicate that while he may have known of
Engleton's plan, he was not a party to it. He did not participate in the purchase of
ammunition. There is no evidence that Vodochodsky actually did any affirmative act to
assist Engleton with the plan. Instead, Vodochodsky had the bad luck of being the friend and
roommate of a man determined to kill police officers and himself. 

 We conclude that proof of Vodochodsky's guilt was so weak as to undermine
confidence in the jury's determination. This evidence was factually insufficient to convict. 
Point of error two is sustained.

 We reverse the judgment of the trial court and remand this case for Vodochodsky to
answer the charges in the indictment.


DATE DELIVERED: March 16, 2005


PUBLISH
1. Tex. Penal Code Ann. § 19.03(a)(1).
2. Art. 37.071, § 2(g). Unless otherwise indicated this and all future references to
Articles refer to the Code of Criminal Procedure.
3. Art. 37.071, § 2(h).
4. Marable v. State, 85 S.W.3d 287 (Tex. Crim. App. 2002)(and cases cited therein). 
5. Jackson v. Virginia, 443 U.S. 307 (1979); Griffin v. State, 614 S.W.2d 155, 159
(Tex. Crim. App. 1981).
6. See Denton v. State, 911 S.W.2d 388, 389-90 (Tex. Crim. App. 1995); Miller v.
State, 667 S.W.2d 773, 776 (Tex. Crim. App. 1984); Rucker v. State, 599 S.W.2d 581, 591
(Tex. Crim. App. 1979); Reynolds v. State, 506 S.W.2d 864, 867 (Tex. Crim. App. 1974). 
See also Garcia v. State, 887 S.W.2d 862, 870 (Tex. Crim. App. 1994).
7. Tex. Penal Code § 7.02(a)(2).
8. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000); see also Goodman v.
State, 66 S.W.3d 283, 285-86 (Tex. Crim. App. 2001).
9. Johnson, 23 S.W.3d at 7.
10. Id.; Santellan, 939 S.W.2d at 164.